The next matter before us is 21-1025 Denver Homeless Out Loud v. Denver. Mr. Farley, we are ready when you are. Thank you. Good morning. May it please the court. Again, my name is Connor Farley, and I'm an attorney on behalf of the city and county of Denver. I'd like to reserve five minutes of my argument for rebuttal. Denver is here today because the district court has severely limited its ability to address the public health and safety emergencies associated with unregulated outdoor encampments of Denver's unhoused residents with the issuance of an unwarranted and defective preliminary injunction. Mr. Farley, your standard of review, or our standard of review, is abuse of discretion, right? It is. And abuse of discretion has some components. You can either be showing that the district court made a mistake of law, which would always be an abuse of discretion, or you could contend that the district court made erroneous factual findings, right? Yes. So I'm confused by a sentence in your reply brief where you state that Denver isn't challenging the sufficiency of the evidence. How does that fit within our standard of review? What do you mean by that? What I mean by that is there are arguments here that the remedy that was assigned and also the components, the factual record that the court below considered to get to those remedies or to find that the preliminary that even taking these facts is true. And we're not contesting the facts, the factual findings below. Let me stop you there. So you're not challenging the factual findings that the district court made in support of the issuance of the injunction here. The only factual findings that we're disputing are whether the findings regarding the Fourth Amendment analysis precluded the findings in the 14th Amendment analysis. Because those were incompatible factual findings, we do challenge that aspect of it. But otherwise, we accept the factual record from below to the extent that there was sufficient record to begin with. Let me ask you this, how does the Lyle versus Denver settlement agreement affect our review? Well, I appreciate that. The Lyle settlement agreement was in front of the same court. It was a case that was in front of the same judge with the same plaintiff's counsel. And it was on behalf of all people that would fit in the same category of the class at issue here. And so the terms of that settlement agreement controlled the regularly scheduled or regular encumbrance removal cleanups, what we as opposed to the DDPHE area restrictions. So to the extent that the court has reopened the Lyle settlement agreement to add additional elements to what DOTI needs to do, the notice requirements, additional elements that were settled among the parties and counsel and the court already, there's no basis simply for the court to reopen that. Well, are you arguing that the court was constrained on the relief it could give by the prior settlement, or that the claim additional claims for relief had been released, or both? I think we're arguing both. I mean, I think to the extent that the court is revisiting the terms regarding regularly scheduled cleanups, or or rather the encumbrance removal cleanups, that is controlled by the settlement agreement. And the plaintiffs here had a remedy in state court, and the court recognized that, and then still decided to add terms to that settlement agreement that are directly controlled. As far as the new claims, the Department of Public Health claims, those arguments are more related to the fact that the court did not sufficiently defer to public health authority and the precedent from the Supreme Circuit. It didn't apply the right law. So they are separate arguments. What law should have the court applied here? It seems to me that you're, that Denver is arguing in part a sort of public health exception to Matthews. How am I misunderstanding your position? Sure, I think that's not, it's not as strong an argument as a public health exception to Matthews across the board. The argument is that in matters of public health and safety, the Tenth Circuit and the U.S. Supreme Court have been clear that quick action may turn out to be wrongful action, but due process requires only a post-deprivation opportunity to establish the error. That's from Comigula v. City of Albuquerque. The argument is that absent a health and safety exception available to the local public authority, this is now opening up the floodgates for significant risk. The court didn't run the Matthews balancing test through the controlling law from the Tenth Circuit and the Supreme Court. And so by not considering Comigula v. City of Albuquerque, North American cold storage versus Chicago, Clark v. City of Draper, these are clear cases that allow post-deprivation hearing as opposed to notice and advanced notice. And those cases run the gamut on the factual circumstances. There's certainly a number of food-related health and safety emergencies that are addressed by Comigula and North American cold storage, but even Miller v. Campbell City, Tenth Circuit case from 1991, that dealt with a gas leak and strange illnesses in a neighborhood and precluded people from living in their houses. That was another example of, in order to show a likelihood of prevailing on the merits, the court would have needed to run these facts through those cases in that framework and it failed to consider it. Mr. Farley, can you, I just want to make sure I understand that the two actions we're only talking about with respect to the scope of this injunction, two actions that Denver could take, the area restrictions and the encumbrance removals, is that right? I don't read it as narrowly as that. The terms, and it highlights a defect in this injunction, the terms of the injunction are Denver, broadly, all agencies, all agents, the named defendants in the case include the manager of public safety, the manager of safety, who oversees the police department and the fire department and the sheriff's department, includes the mayor, includes the city attorney's office. Those are the named defendants. And so the claim is against all, is against Denver in totality. And so, So are you saying that if there was a crime being committed in an encampment or someone saw smoke coming from there and it was a fire, that this injunction prevents Denver from going in and I think that a distinct crime being committed, the police department can address it under the circumstances here because it is not dealing with the, it's not inherently tied to an encampment. Whereas the fire issue or the risk of fire is really the issue that we've highlighted and are most concerned of, not necessarily the fire department coming with hoses to put a fire out, but there's real life examples here of combustibles, of actual fires happening, and the resulting public health and safety risk for those living in the encampments and also those in close contact with the encampments, the buildings. Where on the record has Denver provided any example of this sort of public health crisis that would require the city to take this sort of area restriction and large-scale encumbrance removal action with no notice? I don't see anything in the record that suggests that any example like that was offered. What am I missing? Sure. The thrust of the argument at the hearing was a subset of due process, danger creation claim related to COVID-19. So there was not this element of what harms would that are at issue now. And so the record's thin on this issue. The court below did ask counsel for Denver of examples, and a meth lab was used, the fire hazard was used, the ongoing issues that we see of feces, trash, needles, those are all placed throughout the record as to the harm. The exigency of it, the emergency aspect of it is hard to speculate on. I think that that's why the cases in the 10th Circuit and Supreme Court differ so much to the public health authorities. I think if the public health officers at the hearing were able to think longer or directly asked as to examples of exigent circumstances that would require an injunction, they would have been able to come up with one. But that's why they're the public health experts, not the court below. I think to round that out and to move beyond the record, there are circumstances that have been presented in the last nine months since this injunction was entered. And I think that the clearest example of this would be when the public health authorities visit an encampment. This is not a situation where every single encampment throughout the city is monitored at all times to see when the public health and danger threshold has been reached. And so upon the first time entering an encampment, there have been examples of five-gallon buckets with feces in an encampment that present an emergent threat to health and safety for those in the encampment and those nearby. And because of the terms of this injunction, that emergent situation cannot be addressed. Seven days is the standard that the court below provided and allowed a 48-hour exception, but the 48-hour exception is so cumbersome that under the example that I just raised, there wouldn't be time to address competently or in the standard of care for a public health agency to address that emergent circumstances that should have been addressed immediately instead of waiting, coming up with the documentation and the written support and the publication in order to get the 48-hour exception, or to just simply allow seven days, which is what the court has required. So now the city needs to watch and see a clear and present health risk to those living in the encampment, those living nearby, and sit on their hands. And it's simply not what... Mr. Farley, are you saying... I'm confused with your response to Judge Rossman's questions. Are you saying that there is no emergency to which the city can respond in an encampment without a minimum of 48 hours notice under this order? There's no public health and safety... From a public health perspective, that is true, that from the... There's risk of contempt. There's no question that based on the history of this litigation that Denver will be brought back into the court below and have to fight the contempt issue. But your answer is the same as to a bucket of feces as it would be to a fire that started from an unknown cause, but there's a fire in the encampment. As I read your interpretation, is it you cannot go in there and extinguish the fire without 48 hours notice? I think we can go in and extinguish the fire, Your Honor. I think we cannot mitigate the risk of a fire. So should there be seen open grills, propane tanks, things that are commonly found in encampments, the health and safety risk means that we have to hope for the best. We have to hope that we dodge the bullet and make seven days notice or get together enough documentation and publication to get a 48-hour exemption to address that issue. Well, I assume if you're monitoring that risk, if the risk manifested in an actual fire or an actual emergency, you could, like you just said, go in and deal with that presently existing emergency. I think that if every homeless encampment in the city was monitored at all times, that's a realistic scenario, but they're dispersed and widespread throughout the city. And so in practice, that's not possible. So you could undertake emergency response and you could put out the fire in the grill. You just couldn't confiscate the grill after you put it out. Is that correct? I think what it means is that we can't address the grill prior to the fire. Not that we wouldn't, not the removing of it afterwards, but that we can't mitigate the risk ahead of time. And I have approximately 30 seconds that I'd like to reserve for rebuttal. All right. Mr. McNulty. Thank you, Your Honor, and may it please the court. My name is Andy McNulty, and I'm here arguing on behalf of Plaintiff Denver Homeless Out Loud and a class, a proposed class of unhoused individuals here in Denver, Colorado. I'd like to start on my argument with something that council just conceded on the record here, which is that there is no evidence in the record whatsoever of any emergent public health and safety need that would require less than 48 hours notice. Let me ask you this. If this were a case that was filed for the first time as a class action, I'd have no problem with the breath here, but you already had a bite at the apple and you entered into a settlement agreement on behalf of this class and you waived the right, you waived all claims against these defendants on the same issues. And so while I am perfectly comfortable with what you filed this as, which is an action to enforce the prior settlement agreement, where I have some consternation is where the district court seems to be giving you additional relief that you didn't get in the first action and you waived the right to get. So help me out with that because I am struggling with it. Sure, your honor. These are, these are different plaintiffs. First off, in this case, there's the case arose in different circumstances. The same class, the class is identified. And when you filed it, you filed it as an action to enforce the settlement agreement. Correct. Your honor. Correct. I did. I did, but the cons because of the supremacy cause, the constitution could require things above and beyond what we agreed to in the settlement agreement. You can waive constitutional rights. You just have to do it explicitly, right? Well, your honor, we didn't explicitly waive any constitutional rights in our settlement agreement. I don't believe. And, and, and as, as the court knows, when you enter into a settlement agreement, you don't necessarily get everything that you would like it's bargained. There's bargained for consideration. And if I enter into a settlement agreement and I say in response to what I am getting in, in, I'm not going to sue you again on these claims, these same claims I've, you know, you can't sue the person again on the same claims. I guess I am concerned about, I mean, how, and if you get this relief and you enter into another settlement agreement, are you going to sue again? I mean, is there any end to it? Is there no limit to the release that you sign is ineffectual? I understand the concern, your honor. Let me, let me give a hypothetical that might address something you're talking about. Let's say that there is a prisoner and a prisoner and a class action prisoners, and they enter into agreement about conditions within a jail, for example. And then, you know, two years later, the conditions change and they need to enter, they need to file a new lawsuit to enforce their rights. Under, under the rule proposed by Denver. Typically under those cases, you have continuing jurisdiction of the first court over the settlement, right? Typically. And typically the relief that can be given in subsequent actions is related to the claims and the relief that was bought. Now, if you have a new claim, something totally different than you, you know, before, you know, they weren't doing punitive isolation for months at a time, and now they are, that's, that's a different and new claim, but the claims here are the same. Your honor, they're, they're different if I'm, if I may address that. First off there was, but in the previous lawsuit, there were no claims based on sweeps conducted with no notice whatsoever based on public health and safety justifications. That wasn't happening in the previous lawsuit. The previous lawsuit was about... The first lawsuit discussed explicitly and came to agreement on how much notice had to be given. That's, that's correct. Your honor, that, that did happen. That did happen. But the claims are different... Are the types of encumbrance removals and temporary area restrictions? No, it did not. It only talked about large-scale encumbrance removals as, as defined by Denver. And, and this, this case is seeking something that is completely different in other aspects to it. It related to COVID-19, the COVID-19 pandemic. It talks about the eighth amendment. It talks about a number of other issues that were definitely not an issue with Lyle and the facts and circumstances on the ground have simply changed in the way that Denver conducts these sweeps. But you will, I mean, the action was filed as an action to enforce the Lyle settlement agreement. In certain respects, your honor, yes. Okay. And, and you know, at its core, this appeal is about one issue, your honors, whether Denver can take unhoused individuals possessions, possessions that are necessary for their survival, like tents and sleeping bags without any notice whatsoever. The district court held that it cannot and imposed a few basic notice requirements on Denver before it is allowed to constitutionally take unhoused individuals only worldly possessions. And this court should affirm that ruling. Mr. McNulty, let me ask you this. The judge determined that there, that he showed a likelihood of success on the merits of the due process claim, correct? That's correct. Okay. What is the due process supposed to address? Supposed to address the risk of erroneous deprivation of our client's property. Okay. But you did not show a likelihood of success on the merits of the fourth amendment unlawful seizure, correct? That is correct, your honor. So if, if there is no determination, you prevail that there has been, or any unlawful seizure, then there's no due process to which that should attach because there's been no determination of an unlawful seizure, correct? Uh, that I, I don't, I don't agree with that, your honor. It will surprise you though. Well, you're going to have to help me. You're going to have to help me get through that one. Sure, your honor. And the 14th amendment, um, the 14th amendment balancing test under Matthews, it talks about the risk of erroneous deprivation. It doesn't talk about the actual erroneous property. And so that's a distinguishing factor, but as a, as a, as cited in our briefing in this case, um, this court and the Supreme court has analyzed the 14th and fourth amendment tests in different ways and has determined that maybe that, you know, even, even when there is a valid fourth amendment seizure, um, that due process could be violated because the process given in conducting that seizure was not proper. I'll give you, I'll give you an example. Maybe that could help. But before you give me an example and just tuck that away, cause I want to hear that example, but, but you seem to, uh, use the articulation risk as a, as a way to respond to my question, but isn't the determination that there has not been a showing of the likelihood of success on the merits of showing an unlawful seizure. Isn't, isn't that by definition, a discussion of the risk and that is the risk has not been shown, uh, that there has been an unlawful seizure. No, your honor. I think that the risk, what hasn't been shown is that there have been unlawful seizures. The court said that the current procedures allow for a risk that there could be unlawful seizures. And I think that that's the distinction here. Um, and, and there was evidence in a record that supported that, including an unhoused individual who had his property taken on a night and almost suffered frostbite and nearly died because Denver took his property. And that's in the record at 2529 through 2534. And another individual testified, um, that, you know, he was forced to sleep on the median of Colfax Avenue after his property was, was seized by Denver. And in, and in light of that very evidence, the court determined that there was no likelihood of success for showing that there had been an unlawful seizure in light of that evidence, in light of that evidence. I mean, it seems to me the argument doesn't respond to the question. Well, I think it, I think it does, your honor, we're talking here about risk versus actual, and that's, that's the, that's the sticking point. Um, but on actual, you, you concede what judge Murphy is saying, right? That, that the district court said it couldn't determine that there was a dispute of fact. And so you didn't, it did not find likelihood of success on the actual seizure under the fourth amendment. Correct. Okay. Correct. And, and, and, you know, a 14th amendment, I apologize, your honor, I didn't mean to cut you off. Well, no, what I'm saying, okay. So, but you're saying nonetheless, we have likelihood of success on the 14th amendment because the 14th amendment just looks at risk and not whether that risk was, um, was realized. Is that your argument? Correct. Yeah. And, and a 14th amendment deprivation of property without due process claim does not depend solely on a finding of a fourth amendment, unreasonable seizure. You could have one claim without the other and be successful at the end of the day. Okay. The court had before the evidence that you recited and said that that evidence was not enough to show the likelihood of success that there has been an unlawful seizure. Uh, and you measure risk actuality, right? I look at the actual things and is there a risk that that's going to reoccur? And if, if you have not established the likelihood of success that, that, that occurred, and that is, there was a novel seizure, you have not established the risk. Correct. Well, I, I wouldn't agree with that, your honor. I think that, you know, risk is, is more of a speculative thing. It's, it's, it's, it's talking about, is it, is it going to happen? It's potent. It has a high likelihood of high potential of happening versus actually happened, hasn't actually happened. And so hasn't actually, exactly has not actually happened yet. And so to go back to my example, you know, uh, for example, if you parked your car on the street and someone came and took your car, that could be a fourth amendment claim, right? For a seizure without, without, if there was no notice posted outside, that could be a fourth amendment claim procedure, right? But if, if, if you, if, if there was, if there was notice, then you would have a fourth amendment claim, right? For seizure of your property, if they did it illegally, but you might not necessarily have a 14th amendment claim. So that, that's kind of where I'm coming from with this, but to get back to, um, what I think that this case fundamentally turns on is, uh, Denver's failure to recognize, um, a longstanding and well-recognized distinction between the due process required by the constitution prior to instituting public health orders that merely cause economic harm and the seizure of a homeless individual's only belongings, uh, which presents dire consequences that cannot be remedied by damages after the fact. Um, that's because a seizure of a homeless individual's belongings is a much more serious than, for example, the closing of a restaurant for a few days that was an issue in Camigula or the seizure of spoiled food that was an issue in North American cold storage. And that is to say nothing of a strong evidence in the record that we already talked about. Um, let me, let me interrupt you. Don't we have to remand this anyway, because it does, the injunction violates rule 65. I don't believe it does your honor. Um, you know, well it does on the face of it, doesn't it? If we were to look at what rule 65 says and look at the it, it incorporates by reference, um, things that aren't actually included in the face of the injunction. And that's what rule 65 prohibits, right? Well, rule 65 incorporates it prohibits incorporating it for the purposes of, of not, uh, and, and makes it unreadable without reference to it. And so I think this injunction imposes restrictions on Denver that don't require reference to those documents, similar to the, uh, reference to other documents, uh, in the Gulf, uh, King shrimp case. Um, that's four Oh seven, uh, second five one seven. I'm a Davis versus city and County of San Francisco case that are cited in our briefs. Um, for example, in the Davis case, uh, the court incorporated, um, by reference, a fire department order and, and the ninth circuit held that that was, that was fine under rule 65. So I don't believe that, um, the court's order violates rule 65, your honor. And so at the end of the day, the only revenue that the court, um, could provide to prevent the constitutional harm that was being inflicted on Denver's unhoused residents, um, was to require specific notice as it did. It did so based on established law. It did so within its authority, constitutional authority to remedy constitutional violations. And it specifically addressed the constitutional violation is Florentine junction and did so in a way that was easily readable and, uh, specific so that it could be enforced. Um, since the injunction, Denver has not conducted one 48 hours sweep. It has not provided less than a seven days notice. That shows that their stated public health and safety concerns are non-existent. If it has public health and safety concerns, is all that is all that in the record. Well, it's in the supplemental record, your honor. Um, if you look at the supplemental record, and I think the court can take notice of that on appeal, um, because of, um, because it shows that Denver can comply with the order. Um, and so just in conclusion, it is imperative that this court recognize the fundamental difference between taking an unhoused person's only belongings and closing a restaurant for a few days. And so we'd ask that the court affirm the lower court's order in its entirety. Thank you. Thank you. And I'm Mr. Farley. You have 34 seconds. Mr. Farley, would you, would you respond to the, um, distinction of the fourth amendment and 14th amendment? Yeah. Yes, I will. I think that the, um, that those are incompatible findings as, as the court articulated the fact that there is a, that the court below didn't find that there had actually been a record sufficient to find any seizure that the speculation as to what way happened in the future with seizures and that it may violate the processes that are in place, uh, is incompatible with, uh, requiring additional due process, uh, under the 14th amendment. Uh, but as a final matter, I would argue that you have to have an illegal seizure to have the process be inadequate. I mean, in addition to seizing property, they're running the people out of these parks, public places. Um, and it would require them to have some notice to gather up their belongings and get out of there. I mean, isn't it reasonable? Isn't there a 14th amendment piece of it, even if you don't have an illegal seizure? I think when you look at the balancing of the risks, uh, the, the rare events where there hasn't been noticed, but in a public health area restriction, uh, outweigh, uh, the, the risks identified by plaintiffs here of, uh, of property being, uh, lost in the storage and the disposal of hazards process. So I think that the, uh, the corporal error, uh, in, in having incompatible findings on whether such, such loss of property, uh, actually ever happened. I think that it speaks to the fact that the process that Denver has in place is sufficient, uh, and, and, uh, it should, the status quo should be preserved and the to address emergent public health concerns to the city at large. I near time. Thank you camp. Oh, did you have, I'm sorry, judge Ross. May I ask one more question? Yes. Um, okay. Mr. Farley, I just wanted to ask as, as we are sitting in an abusive discretion review over the district courts, um, the balance of harms analysis, would you agree that the balance of harms analysis for plaintiffs is unique? It's heightened somehow because the property that we're talking about is property that is, you know, not like I lost my scarf, favorite scarf in the park. I mean, this is property that is critical to survival. So does that factor differently in the balance of harms analysis? Uh, you're on the right. I think that there can be scenarios where, uh, that argument can be made, but I don't think it applies here. And I don't think the record supports that as well. I think that the record supports that there was based on the terms of the Lyle settlement. Uh, and in practice, even during DDPHE area restrictions, that there was a storage and retrieval process. Uh, and the fact that plaintiff has identified two individuals, uh, in the record who had what would they described as, as certainly egregious circumstances where they were unhoused without their property, uh, is an exception as opposed to the rule, uh, that, that Denver has housing available in the shelter space available for people experiencing homelessness every single night. Uh, and that the, the, the property that, uh, was stored was retrievable. And should that not have happened, then there is a clean process and there's a remedy here, uh, in the civil lawsuit. That, that differentiation between types of property, and that is critical property versus non-critical property, is that a matter for judicial balancing or is that a matter for the legislative process to deem that certain property and certain people are to be treated, uh, perhaps differently, uh, when it comes to utilizing public property? I certainly think that the, um, the, the public health concerns and the, uh, legislative concerns of the city and how it balances access to public spaces and the safety of those in public spaces and those, uh, who pass through has a, uh, has a, a heavy weight. I think that is important to consider the, um, the, the city's, the, the public response to protect the, um, areas available for everybody in the city at all times, uh, is a significant consideration. If there are no further questions, I'm going to give Mr. McNulty, uh, four minutes because, uh, we let Mr. Farley go four minutes over. So, Mr. McNulty. Thank you, Your Honor. Um, I guess the, the one thing that I'd like to address is the public health and safety concerns because that seems to be the thrust of, um, defendants or, uh, appellants argument in this case. And, uh, and, and that was clearly, the court clear below clearly found that there was no public health and safety concern and found that the only reason that these was because of a fear of a protester showing up and, uh, disrupting and having their voices be heard during these sweeps. Do you think that the district court sufficiently factored in the safety of the individuals, the Denver individuals who would be implementing the area restrictions into the public health and safety analysis? I think, I think the court did, Your Honor. Um, heard testimony relating to this, uh, from multiple officials from, uh, DOTI and cross examination by, uh, counsel here and on cross examination, um, Ms. Lee and the head of DOTI also, um, admitted that the only concern that they had was people were yelling mean things at them, which is clearly first member protected activity. And I understand not wanting to have mean things yelled at you. I've had mean things yelled at me in the past, certainly. Um, but that certainly doesn't, uh, that doesn't, um, rise to the level of an actual public health and safety concern, especially when, um, you know, there've been a number of sweeps prior to that, and there'd been no instances where anyone had used violence against anyone during a sweep. I actually understood Judge Rossman's question a little differently, but maybe I misunderstood and I'll ask a different one, which is, did the district court adequately consider the health and safety interests of the residents of Denver who live near these, um, encampments? Or the students in the, in the, that are adjacent to the one park. Or, or the judges that go to and from the Byron White Courthouse. Sure, Your Honor. And I think it did in, in, in its limitations in this order. If you look at the in the order talks about coming in, if there is evidence of, um, you know, live flame going on, nothing would stop Denver Police Department, Fire Department from coming in and putting out, putting out fires, things of that nature. This is talking about. It's more something like a rat infestation that, you know, if you have to wait, it, it, it doesn't stay contained. Right. So neighbors might be affected. Sure, Your Honor. And the evidence in the record in this case is that Denver monitors these encampments for months prior to conducting the sweep. So, and rat infestations don't happen overnight. So to say that, and, and, and they did, they monitored the encampments, the two main encampments in this case that are, were at issue with the preliminary injunction hearing for months, um, prior to conducting a sweep. And in fact, decided to conduct the sweep over 48 hours prior to conducting it without providing any notice to the encampment residents. So I think the court did weigh that in, in its order. Um, it talked about the public health and safety risks generally to, um, folks and recognize that there are public health and safety risks, um, that encampments pose, but that those public health and safety risks don't outweigh under the Mount Matthews balancing tests, the very real interest that unhoused folks have in their property, their only possessions being taken away from them without any notice whatsoever. And the risk of losing those possessions, which could include serious bodily injury and death. Thank you. I have nothing further unless anyone else has any questions. We will take this matter under advisement. We appreciate your argument on this difficult case. Thank you.